[Cite as *State v. Velez*, 2022-Ohio-3707.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 22AP-300 |
| | | (C.P.C. No. 21CR-3449) |
| v. | : | |
| | | (ACCELERATED CALENDAR) |
| Rogelio Velez, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on October 18, 2022

**On brief**: *G. Gary Tyack*, Prosecuting Attorney, and *Kimberly M. Bond*, for appellee.

**On brief**: *Brian J. Rigg*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

McGRATH, J.

{¶ 1}  This is an appeal by defendant-appellant, Rogelio Velez, from a judgment of the Franklin County Court of Common Pleas authorizing the involuntary administration of medication, pursuant to R.C. 2945.38(B), to restore his competency to stand trial.

{¶ 2}  On August 23, 2021, appellant was indicted on one count of harassment with a bodily substance, in violation of R.C. 2921.38, a felony of the fifth degree.  The indictment alleged conduct occurring on August 14, 2021; the alleged victim was a law enforcement officer.  On October 8, 2021, counsel for appellant filed a motion, pursuant to R.C. 2945.37, to refer appellant to the Netcare Forensic Psychiatry Center ("Netcare") for examination as to his present mental condition.

{¶ 3}  By entry filed October 11, 2021, the trial court ordered appellant to submit to a psychiatric examination to be conducted by a Netcare psychiatrist.  Following that

evaluation, the matter came for hearing before the trial court on November 29, 2021. During that hearing, the parties stipulated to "the Netcare report" finding appellant "not competent but restorable." (Nov. 29, 2021 Tr. at 3.)

{¶ 4} The trial court filed an entry on November 29, 2021, finding appellant not competent to stand trial and ordering treatment. The court ordered appellant "to undergo treatment to restore competency for the period of six (6) months," and further ordered him to be placed in the "Twin Valley Behavioral Healthcare * * * Unit, for a period of treatment as the least restrictive alternative available consistent with public safety and treatment goals, preference being given to protecting public safety." (Nov. 29, 2021 Entry at 2.)

{¶ 5} On May 6, 2022, the matter came for hearing before the trial court on an application for involuntary psychotropic medications filed by Twin Valley Behavioral Healthcare ("Twin Valley"). During the hearing, the court heard the testimony of Dr. Christopher J. Corner, appellant's treating psychiatrist at Twin Valley, who diagnosed appellant as suffering from psychosis and delusions. The trial court also admitted into evidence a report by Dr. Corner (State's Ex. A) by stipulation.

{¶ 6} On May 10, 2022, the trial court issued an order finding appellant "cannot be restored to competency" if allowed to continue to refuse medication. The court ordered appellant to "take all medication prescribed," and authorized the staff of Twin Valley to administer medication by force if necessary.

{¶ 7} On appeal, appellant sets forth the following assignment of error for this court's review:

> The trial court erred to the prejudice of Appellant by failing to make evidence-based findings in ordering Appellant to undergo a regimen of forced medication in an effort to restore him to competence to stand trial.

{¶ 8} Under his single assignment of error, appellant contends the trial court failed to "comply completely" with the holding of the United States Supreme Court in *Sell v. United States*, 539 U.S. 166 (2003), in which the Supreme Court delineated a four-factor test to determine whether involuntary medication may be utilized to render a criminal defendant competent to stand trial. (Appellant's Brief at 4.) Specifically, appellant challenges the findings of the trial court relevant to the second factor of the four-factor test in *Sell*.

{¶ 9} Both the United States Supreme Court and the Supreme Court of Ohio have held that "[f]undamental principles of fairness and due process demand that a criminal defendant who is not legally competent may not be tried or convicted of a crime." *State v. Lanier*, 10th Dist. No. 20AP-480, 2021-Ohio-4194, ¶ 7, citing *Pate v. Robinson*, 383 U.S. 375 (1966); *State v. Berry*, 72 Ohio St.3d 354, 359 (1995). The constitutional test for determining competency to stand trial is "whether the defendant has sufficient present ability to consult with their lawyer with a reasonable degree of rational understanding, and whether they have a rational as well as factual understanding of the proceedings against them." *Lanier* at ¶ 7, citing *Berry* at 359.

{¶ 10} Under Ohio law, the provisions of R.C. 2945.38(B)(1)(c) "govern[] the involuntary administration of medication to a criminal defendant." *Id.* at ¶ 9. R.C. 2945.38(B)(1)(c) states as follows:

> If the defendant is found incompetent to stand trial, if the chief clinical officer of the hospital, facility, or agency where the defendant is placed, or the managing officer of the institution, the director of the program or facility, or the person to which the defendant is committed for treatment or continuing evaluation and treatment under division (B)(1)(b) of this section determines that medication is necessary to restore the defendant's competency to stand trial, and if the defendant lacks the capacity to give informed consent or refuses medication, the chief clinical officer of the hospital, facility, or agency where the defendant is placed, or the managing officer of the institution, the director of the program or facility, or the person to which the defendant is committed for treatment or continuing evaluation and treatment may petition the court for authorization for the involuntary administration of medication. The court shall hold a hearing on the petition within five days of the filing of the petition if the petition was filed in a municipal court or a county court regarding an incompetent defendant charged with a misdemeanor or within ten days of the filing of the petition if the petition was filed in a court of common pleas regarding an incompetent defendant charged with a felony offense. Following the hearing, the court may authorize the involuntary administration of medication or may dismiss the petition.

{¶ 11} This court has previously observed that R.C. 2945.38(B)(1)(c) "does not set forth specific standards for a trial court to apply in determining whether to order the involuntary administration of medication to restore a criminal defendant's competence to

stand trial." *State v. Ramey*, 10th Dist. No. 19AP-642, 2019-Ohio-5087, ¶ 9, citing *State v. McClelland*, 10th Dist. No. 06AP-1236, 2007-Ohio-841, ¶ 4.  In *Sell*, however, the United States Supreme Court "addressed whether the 'forced administration of antipsychotic drugs to render [a defendant] competent to stand trial unconstitutionally deprive[s] [a defendant] of his [or her] "liberty" to reject medical treatment.' " *Ramey* at ¶ 9, quoting *Sell* at 177.  The Supreme Court in *Sell* "determined that '[t]he Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.' " *Ramey* at ¶ 9, quoting *Sell* at 179.

{¶ 12} The Supreme Court "formulated a four-factor test to determine whether the involuntary administration of medication may be used in order to render a defendant competent to stand trial." *Id.*, citing *Sell* at 180-81.  Accordingly, "a trial court must make the following findings prior to authorizing involuntary administration of medication to a criminal defendant: (1) the existence of an important governmental interest, (2) that involuntary medication will significantly further the state's interest, (3) that involuntary medication is necessary to further the state's interest, and (4) that the administration of the medication is medically appropriate for the individual defendant." *Lanier* at ¶ 11, citing *Sell* at 180-81.  Further, "[t]he trial court must make specific findings regarding the factors enunciated in *Sell*." *Id.*, citing *McClelland* at ¶ 9.

{¶ 13} In the present case, appellant acknowledges that "[t]he trial court's decision cites the *Sell* factors," but argues the evidence adduced before the trial court "must support that claim." (Appellant's Brief at 8.)  Where a trial court conducts a hearing and makes specific findings under *Sell*, "[t]his court must review the findings in the trial court and 'determine whether it is against the manifest weight of the evidence.' " *State v. Sowards*, 10th Dist. No. 21AP-304, 2021-Ohio-4462, ¶ 12, quoting *Ramey* at ¶ 11.  Under Ohio law, " ' "[j]udgments supported by some competent, credible evidence addressing all the essential elements of the case will not be reversed on appeal as against the manifest weight of the evidence." ' " *Id.* at ¶ 12, quoting *Ramey* at ¶ 11, quoting *In re J.F.*, 10th Dist. No. 06AP-1225, 2007-Ohio-2360, ¶ 23.

{¶ 14} Although appellant only challenges the trial court's determination as to the second *Sell* factor, we will address each of the factors in turn. With respect to the first factor, which "requires the trial court to find that important governmental interests are at stake," the *Sell* court recognized that "[t]he government's interest in prosecuting 'an individual accused of a serious crime is important.' " *Lanier* at ¶ 13, quoting *Sell* at 180. In the present case, the record indicates appellant was charged with one count of harassment with a bodily substance, in violation of R.C. 2921.38, a fifth-degree felony (punishable by up to 12 months imprisonment), the alleged victim being a law enforcement officer. In general, "[a] 'serious' crime, as defined by the United States Supreme Court, and pursuant to the Ohio Rules of Criminal Procedure, is one in which a defendant may be sentenced to imprisonment for more than six months." *State v. Brewer*, 12th Dist. No. CA2008-04-040, 2008-Ohio-6193, ¶ 16. Here, both the potential term and nature of the offense (harassment of a law enforcement officer by means of a bodily substance) support a determination that a serious offense is implicated, and we find no error with the trial court's finding that "government and trial-related interests" were at stake in bringing appellant to trial. (May 6, 2022 Tr. at 31.)

{¶ 15} Under the second *Sell* factor, which "obligates the trial court to find that involuntary medication will significantly further the state's interest," a trial court "must conclude that administration of the medication is 'substantially likely to render the defendant competent to stand trial' and 'substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense.' " *Lanier* at ¶ 14, quoting *Sell* at 181. Thus, the second *Sell* factor "contains two subfactors." *Sowards* at ¶ 11. *See also State v. Jefferson*, 1st Dist. No. C-200135, 2021-Ohio-2092, ¶ 7 (the second *Sell* factor "actually poses a two-pronged inquiry").

{¶ 16} The focus of appellant's argument on appeal is on the latter subfactor (i.e., whether the administration of medication is substantially unlikely to have side effects that would interfere significantly with his ability to assist his counsel). Appellant argues that Dr. Corner testified during the hearing that the drugs he proposed to administer as part of a treatment plan have side effects, including muscle stiffness or aches, drooling, excess salivation, and long-term consequences such as tardive dyskinesia. Appellant argues that Dr. Corner did not testify with enough specificity regarding how appellant's symptoms would be managed "[f]or example," in the event of his transfer to the county jail for trial.

(Appellant's Brief at 7.)  More specifically, appellant maintains that Dr. Corner "failed to describe how Appellant's symptoms would be managed; by whom they would be managed by if he was held at the county jail; or who at Twin Valley (or the county jail) would determine if Appellant would be taken into the courtroom each day." (Appellant's Brief at 8.)  According to appellant, the trial court's decision is not based on any concrete plan to manage appellant's symptoms during a jury trial.

{¶ 17} In support of his argument, appellant relies on Justice Kennedy's concurrence in *Riggins v. Nevada*, 504 U.S. 127 (1992) (Kennedy, J., concurring).  In his concurrence in *Riggins*, Justice Kennedy emphasized the significant side effects of many psychotropic medications, stating his view that in the absence of an "extraordinary showing by the State, the Due Process Clause prohibits prosecuting officials from administering involuntary doses of antipsychotic medicines for purposes of rendering the accused competent for trial." *Id.* at 139.  Justice Kennedy further expressed "doubt that the showing can be made in most cases, given our present understanding of the properties of these drugs." *Id.*

{¶ 18} In response, the state argues that, while the concurring opinion of Justice Kennedy in *Riggins*, authored nearly 30 years ago, raises many valid concerns with the side effects of antipsychotic medications, Justice Kennedy also acknowledged that these concerns may evolve over time as "the state of our knowledge of antipsychotic drugs and their side effects develops."  (State's Brief at 9.)  The state maintains that Dr. Corner's testimony in this case illustrates the fact that medical understanding of antipsychotic medications has developed in a way that permits them to be administered with minimal side effects.

{¶ 19} As noted, Dr. Corner, appellant's treating psychiatrist, diagnosed appellant as suffering psychosis.  At the time of Dr. Corner's evaluation, appellant made statements as to his belief that "police forces" in several states "were all in league against him * * * and that they had conspired to harass him." (May 6, 2022 Tr. at 10.)  Appellant also "suggested that his attorney was three separate people, [and] they all went by the same name." (May 6, 2022 Tr. at 9.)  The psychiatrist described the statements as reflecting "classical fixed delusions." (May 6, 2022 Tr. at 10.)

{¶ 20} During the hearing on the application for involuntary medication, Dr. Corner testified that antipsychotic medications have shown "proven efficacy in treating psychosis

for many people." (May 6, 2022 Tr. at 13.) The psychiatrist noted side effects of these medications include the risk of "stiffness or aches," as well as "drooling" and "excess sal[i]vation," referred to as "extrapyramidal side effects." (May 6, 2022 Tr. at 14.) He stated that "extrapyramidal side effects can be treated with other medications that can alleviate those symptoms." (May 6, 2022 Tr. at 14.) The psychiatrist stated that one risk that does "not have effective treatment yet" is "[t]ardive dyskinesia," but he noted "[t]here are a couple of new drugs out that can treat it partially." (May 6, 2022 Tr. at 14.)

{¶ 21} With respect to the individualized treatment plan for appellant, Dr. Corner testified "we would start him with Haldol as an injectable and use the others if there are other issues that arise and then use them judiciously." (May 6, 2022 Tr. at 17-18.) He noted that appellant had a history of treatment with Haldol, having been administered the drug in 2015 at another treatment facility. Dr. Corner further testified that appellant had responded favorably to this drug after an initial administration of the medication upon his arrival at Twin Valley.

{¶ 22} Dr. Corner testified that appellant would be monitored for side effects. He stated that "[s]ome of the newer antipsychotic medications are generally conceived to be somewhat safer, less likely to cause tardive dyskinesia, * * * less prone to cause side effects." (May 6, 2022 Tr. at 15.) The psychiatrist emphasized "there are medications that we can use to mitigate the adverse responses to some of the antipsychotic medications that can be quite helpful in making the patient then tolerate the antipsychotics." (May 6, 2022 Tr. at 18.)

{¶ 23} When asked on direct examination if "any of the medications that we've talked about" would likely impair appellant's ability to communicate with his trial lawyer, Dr. Corner responded: "Quite the opposite. I think that one of the goals of the medication [was] to help [appellant] have faith and * * * confidence in his trial attorney." (May 6, 2022 Tr. at 20.) Dr. Corner further testified that "without the medications, there will be no improvement in his mental condition, and he will not be competent to stand trial." (May 6, 2022 Tr. at 13.)

{¶ 24} In response to an inquiry on cross-examination, Dr. Corner reiterated his view that the medications would help appellant communicate with his attorney. When questioned whether side effects could potentially impact appellant if he were in front of a jury, Dr. Corner responded: "I suppose potentially that could happen, but * * * our job is to

use the medications in a careful, skillful manner that mitigates the sort of side effects that would impact like that." (May 6, 2022 Tr. at 26.)

{¶ 25} As noted, appellant contends Dr. Corner did not testify with enough specificity as to how appellant's symptoms would be managed in a future trial setting. In advancing this argument, appellant suggests scenarios he argues were not addressed during the hearing, including how his medications and symptoms would be managed (and by whom) in the event he is transferred to the Franklin County Jail for trial, and whether anyone from Twin Valley would be present at the courthouse in the event he would need treatment for side effects.

{¶ 26} This court has previously addressed such "hypothetical scenarios" in the context of the second *Sell* factor. *Ramey* at ¶ 25. In *Ramey*, the appellant argued that the testimony of the attending psychiatrist did not support the trial court's finding that "the potential side effects associated with the administration of Haldol will not interfere significantly with [the] appellant's ability to receive a fair trial." *Id.* at ¶ 22. In support, the appellant in *Ramey,* as in the instant case, cited "Justice Kennedy's concurring opinion in *Riggins.*" *Id.* The appellant in *Ramey* also asserted (as appellant does in this case) that the testimony of the attending psychiatrist (Dr. Gary Davis) failed to address how the appellant's symptoms would be managed in the future.

{¶ 27} In addressing those issues, this court held in part:

> We take no issue with Justice Kennedy's pronouncements in *Riggins*. However, we find that Dr. Davis's testimony addresses and satisfies the concerns raised by Justice Kennedy. As noted above, Dr. Davis expressly testified that he "would expect the medication side effects not to interfere with [appellant's] ability to work with his attorney and have a fair trial." * * * In addition, Dr. Davis addressed the specific concerns raised by appellant's counsel pertaining to each of the potential side effects of Haldol, opining that those side effects are "rare" and "uncommon" and are treatable with Cogentin.
>
> Appellant's chief argument concerns Dr. Davis's alleged "fail[ure] to describe how Appellant's symptoms would be managed," i.e., "by whom they would be managed if he was held at the county jail; or who at [Twin Valley] (or the county jail) would determine if Appellant would be taken into the courtroom each day." * * * To be sure, Dr. Davis admitted uncertainty about the hypothetical scenarios posed by appellant's counsel regarding symptom management during

trial. However, Dr. Davis repeatedly emphasized that the side effects of Haldol were manageable with dosage adjustments, medication changes, or both, that the sudden development of debilitating side effects during the trial would be "highly unlikely," and that he had never encountered such circumstances.

As noted by appellee, State of Ohio, appellant's argument is based on hypothetical scenarios the trial court was not required to accept. At oral argument, counsel for appellant averred that appellant is currently housed at Twin Valley. At this juncture, neither this court nor the trial court are able to predict whether appellant will remain at Twin Valley once he is found competent to stand trial, or whether he will be transported to the Franklin County jail for the trial proceedings. Moreover, neither this court nor the trial court are able to predict what side effects, if any, appellant may experience. Indeed, Dr. Davis, appellant's own treating psychiatrist, testified that he could not predict "precisely what side effects [appellant] would have" were he prescribed the Haldol/Cogentin mix. * * * Accordingly, it would be quite difficult, if not impossible, for Dr. Davis to opine with any specificity as to hypothetical arguments about where appellant will be housed during trial or how the development of potentially debilitating side effects during trial would be managed, particularly given his testimony that such scenario was unlikely to occur. Appellant's hypothetical arguments are mere speculation and do not negate Dr. Davis's testimony that the side effects of Haldol can be managed with dosage adjustments, medication changes, and use of Cogentin and will not interfere with his right to a fair trial. We further note that should such side effects develop during trial, appellant's trial counsel may request, or the trial court may sua sponte order, additional proceedings regarding appellant's competency.

*Ramey* at ¶ 23-25.

{¶ 28} Based on the above cited testimony of the attending psychiatrist, as well as a joint exhibit (i.e., the application to authorize forced medication, containing detailed information of the treatment plan), this court found "no error in the trial court's conclusion that '[a]dministration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense in a way that would render the trial unfair.' " *Id*. at ¶ 26.

{¶ 29} In a case subsequent to *Ramey,* this court again considered the argument that a psychiatrist " 'did not testify with enough specificity how Appellant's symptoms would be managed.' " *Sowards* at ¶ 22. In *Sowards,* the appellant argued " '[f]or example, if Appellant were transferred to the Franklin County Jail for trial, [the testifying psychiatrist] did not articulate, and was not even asked, how Appellant's medications, and the resulting symptoms would be managed or who would manage them.' " *Id.* Further, it was argued " '[i]f Appellant were maintained at [Twin Valley], [the psychiatrist] was not asked to opine whether Appellant would be taken to court for trial if he was experiencing the symptoms described in the Joint Exhibit,' " nor was the psychiatrist " 'asked if anyone from [Twin Valley] would be present at the courthouse should Appellant need medical treatment for any side effects.' " *Id.*

{¶ 30} Relying on our earlier holding in *Ramey,* this court found unpersuasive such hypothetical inquiries, holding in part:

> The concerns advanced by appellant are all based on conjectural situations that will only occur at a future date during appellant's trial. "[A]ppellant's argument is based on hypothetical scenarios the trial court was not required to accept." *Ramey* at ¶ 25. Appellant is currently housed at [Twin Valley], and it is pure speculation to discuss whether appellant will remain at [Twin Valley] once he is rendered competent to stand trial or be transferred to the Franklin County jail. Dr. Singh testified that as long as appellant is taking medication "there is always risk of side effects." * * * However, no one is able to opine with any degree of psychiatric accuracy the exact symptoms appellant will be experiencing at trial. "Moreover, neither this court nor the trial court are able to predict what side effects, if any, appellant may experience." *Ramey* at ¶ 25. Dr. Singh has opined that severe side effects were unlikely to occur, and even if asked, it would be difficult for him to respond to hypothetical questions about potentially incapacitating side effects appellant may experience during trial. [Twin Valley] submitted a comprehensive treatment plan with Dr. Singh's report, and it addresses the medical management of side effects now and in the future. (State Ex. 1.) Dr. Singh specifically testified that the "side effects can be easily conquered," and the hypothetical arguments of appellant do not nullify his medical opinion. * * * "Appellant's hypothetical arguments are mere speculation and do not negate [the psychiatrist's] testimony that the side effects of [the medication] can be managed with dosage adjustments, medication changes, and use of [the medication] will not interfere with his right to a fair trial."

> *Ramey* at ¶ 25 * * *. Obviously, if appellant experiences side effects at court during trial, appellant's counsel, or the court sua sponte may take appropriate action regarding appellant.

*Sowards* at ¶ 23.

{¶ 31} Based on the holdings in this court's decisions in *Ramey* and *Sowards,* the trial court was "not required to accept" the type of hypothetical scenarios now raised by appellant. *Ramey* at ¶ 25. As outlined above, Dr. Corner testified as to the proposed treatment plan, including the drugs to be used, as well as the issue of side effects and the steps that would be taken to monitor and address such side effects. Dr. Corner further opined that the benefits of administering the medications outweigh the risk of potential side effects. Based on the evidence presented, the trial court did not err in its determination that the medication was "substantially unlikely to have * * * side effects that would undermine the fairness of the trial." (May 6, 2022 Tr. at 30.) We further note the trial court heard testimony by Dr. Corner in which he indicated there is a "substantial likelihood" of appellant being restored to competence. (May 6, 2022 Tr. at 28.) On review, the record supports the trial court's finding that the elements under the second *Sell* factor were satisfied.

{¶ 32} With respect to the third *Sell* factor, obligating the trial court to "find that involuntary medication is necessary to further the government's interests," a court "must determine that 'any alternative, less intrusive treatments are unlikely to achieve substantially the same results.' " *Lanier* at ¶ 18, quoting *Sell* at 181. During the hearing in this case, Dr. Corner testified that "without the medications, there will be no improvement in his mental condition, and he will not be competent to stand trial." (May 6, 2022 Tr. at 13.) He further emphasized that "[w]ithout medication there is no hope that we could treat this whatsoever." (May 6, 2022 Tr. at 19.) The trial court also heard testimony by the psychiatrist that appellant "does not believe he has an illness whatsoever, so he does not believe that he needs medication, nor does he intend to take medication." (May 6, 2022 Tr. at 12.) The record in this case supports the trial court's finding that "there are no less intrusive alternatives available" to restore appellant's competence. (May 6, 2022 Tr. at 30-31.)

{¶ 33} Under the fourth *Sell* factor, a court is required to find that "administration of the medication is medically appropriate, i.e., 'in the patient's best medical interest in light

of his medical condition,' " and with respect to this factor "the 'specific kinds of drugs at issue may matter here,' as different medications may 'produce different side effects.' " *Lanier* at ¶ 19, quoting *Sell* at 181. During the hearing, Dr. Corner identified the proposed individualized treatment plan he prepared for appellant (as set forth in the stipulated trial exhibit), including a list of medications the psychiatrist determined would be effective in treating appellant's psychosis, as well as a list of medications for side effects. That plan included the provision of laboratory services and other associated testing (i.e., EKG, urinalysis, and x-rays) as necessary. Dr. Corner testified as to the appropriateness of the drugs for appellant's condition and opined that, in the absence of treatment with the listed medications "there will be no improvement." (May 6, 2022 Tr. at 21.) Upon review of the testimony and evidence presented, the trial court did not err in concluding that "involuntary administration of medication is medically appropriate." (May 6, 2022 Tr. at 30.)

{¶ 34} This court's review of the record demonstrates the trial court did not err in granting the application for involuntary administration of medication. Accordingly, appellant's single assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

LUPER SCHUSTER, P.J., and KLATT, J., concur.

_____