COURT OF APPEALS
DECISION
DATED AND FILED

January 13, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.** **2025AP2250-CR**
**2025AP2251-CR**

Cir. Ct. Nos. 2024CF2008
2024CF2270

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

M. L. H.,

DEFENDANT-APPELLANT.

APPEALS from orders of the circuit court for Brown County: BEAU G. LIEGEOIS, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Mary[1] appeals orders authorizing the involuntary administration of medication to restore her to competency in two criminal cases. *See* WIS. STAT. § 971.14(5)(am); WIS. STAT. RULE 809.109. She also appeals an order that denied her motions for postdisposition relief in both of those cases.[2] Mary contends that the State presented insufficient evidence to support the issuance of involuntary medication orders and that her attorney was constitutionally ineffective during the hearing regarding those orders. We reject Mary's arguments and affirm.

## BACKGROUND

¶2 On November 8, 2024, the State filed a criminal complaint in Brown County Case No. 2024CF2008 charging Mary with knowingly fleeing or eluding an officer, a Class H felony, and obstructing an officer, a Class A misdemeanor, both counts as a repeater. According to the complaint, a postal worker called police after she observed Mary speeding on the wrong side of the road in a school zone. The postal worker reported that Mary's vehicle was "coming right at her" and that she "thought the vehicle was going to hit her."

---

[1] For ease of reading, we refer to the appellant in these confidential matters using a pseudonym, rather than her initials. *See* WIS. STAT. RULE 809.109(6) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

[2] Mary has filed identical briefs in these appeals. On our own motion, we now consolidate the appeals for disposition. *See* WIS. STAT. RULE 809.10(3).

Additionally, we note that Mary has filed a motion for a three-judge panel in both of these appeals. However, because the underlying cases involve felony criminal charges, these appeals have already been designated as appeals to be decided by a three-judge panel. *See* WIS. STAT. § 752.31(1)-(2). We therefore deny Mary's motions for a three-judge panel as unnecessary.

2

¶3    An officer located Mary's vehicle, activated his squad car's emergency lights, and pulled behind Mary's vehicle. The officer made contact with Mary, who began making "nonsensical comments." When the officer asked Mary to step out of her vehicle, she refused to do so. While the officer was speaking to a colleague, Mary locked her vehicle's doors and drove away from the traffic stop.

¶4    Mary was located and arrested the following day. She was released on bond, and her bond conditions required her to "make all court appearances" and "commit no criminal law violations." Her attorney subsequently raised an issue regarding her competency, and a competency hearing was scheduled for December 10, 2024. Mary failed to appear at that hearing, however, and the circuit court issued a bench warrant. Mary was later arrested on December 17, 2024, and the State charged her with three new offenses, each as a repeater, in Brown County Case No. 2024CF2270: (1) felony bail jumping (missed court), a Class H felony; (2) obstructing an officer, a Class A misdemeanor; and (3) felony bail jumping (new law violation), a Class H felony.

¶5    On January 9, 2025, the circuit court ordered competency evaluations in both of the cases against Mary. On February 7, 2025, the court found Mary incompetent to proceed in both cases and ordered her committed to the Department of Health Services (DHS) for treatment. On March 5, 2025, the DHS informed the court by letter that it had determined that Mary was not suitable for participation in the "Outpatient Competency Restoration Program" but was eligible to begin receiving "Jail Based Remediation Services." Mary was subsequently admitted to the Mendota Mental Health Institute (MMHI) on June 13, 2025.

¶6     On June 20, 2025, Mary's treating psychiatrist at MMHI, Dr. Michelle Hume, filed a motion for an involuntary medication order, which included an attached individual treatment plan.  In the motion, Hume reported that when Mary was admitted to MMHI for treatment, it was "immediately evident" that "she had mania and delusions."  According to Hume, Mary stated that she is "wealthy, a member of the Illuminati, and that she governs all 50 states."  Mary also stated that she is "with Google so [she] can do anything she wants."

¶7     Hume diagnosed Mary with schizoaffective disorder and noted that Mary's available treatment records revealed "a long history of mental illness and multiple psychiatric hospitalizations."  Hume noted that Mary had been prescribed various antipsychotic medications in the past, including lurasidone, ziprasidone, quetiapine, haloperidol, and aripiprazole, and that she had also been prescribed "lamotrig[i]ne and valproic acid, which are mood stabilizers."  According to Hume, Mary's records "indicate[d] that she was able to productively function in the community when she was compliant with her medications."  For instance, Mary "showed symptom improvement in 2020 when she was prescribed haloperidol, and remained symptom free when her medications were switched to aripiprazole."  Hume noted, however, that Mary had a "history of frequently refusing voluntary treatment," which resulted in the return of her symptoms.

¶8     Hume described three different meetings that she had with Mary, in which Mary insisted that she had no mental health problems and refused to take any medications.  Hume attempted to explain the advantages and disadvantages of medication, but Mary "spoke over [Hume's] attempted explanations, and loudly insisted that she had been poisoned by medications in the past, that she was not schizophrenic, and did not need any treatment."

4

¶9     In the individual treatment plan that Hume submitted to the circuit court, Hume explained that if the court granted an involuntary medication order, she would first offer Mary the choice to take any one of five different antipsychotics—aripiprazole, paliperidone, olanzapine, risperidone, or lurasidone—because all of those medications were "reasonable choices" and "the risk and benefit profiles in women are similar." Hume did not include haloperidol as one of the potential antipsychotics for Mary because Mary had previously reported side effects from that medication. Hume explained that if Mary were unwilling or unable to choose one of the listed antipsychotics, Hume would choose aripiprazole, as Mary had responded well to that medication in the past with no known side effects.

¶10     Hume listed the maximum daily oral dosages for each of the antipsychotics set forth in the individual treatment plan. She explained that Mary "would ONLY be administered medication by injection if she refused to take the medication orally," and in that case, Hume "would administer a long-acting injectable to avoid the need for daily injections."

¶11     The individual treatment plan further stated that, initially, Hume expected "to only administer a single antipsychotic." Hume noted, however, that "patients with prominent manic symptoms like [Mary]" may require "a mood stabilizer in addition to an antipsychotic." Consequently, if an antipsychotic alone proved insufficient to treat Mary, Hume would ask Mary which of two mood stabilizers she preferred—either lithium or valproic acid—as both are "reasonable treatment options and have comparable risks and benefits." The individual treatment plan stated that the maximum dosage of either of those medications would be "determined by blood level."

5

¶12     Hume opined that Mary is "unable to express an understanding of the advantages and disadvantages of medications" because she is "currently psychotic, with active hallucinations and delusions," and is "not in touch with reality." Hume further opined that medication would likely render Mary competent to stand trial because Mary had previously responded well to antipsychotic and mood-stabilizing medications, and "[i]f the medication is administered on a daily basis, she is likely to be able to engage on a rational basis." Hume also stated that Mary was unlikely to become competent without medications because "[i]n the community, she has rapidly become ill if she stops taking her medication."

¶13     The circuit court held an involuntary medication hearing on June 27, 2025. Mary was represented by counsel at the hearing,[3] and she had the opportunity to participate in the hearing via Zoom, but she refused to do so. Hume testified at the involuntary medication hearing, and her motion for involuntary medication and individual treatment plan were entered into evidence. Consistent with those documents, Hume testified that the medications listed in the treatment plan would help Mary become competent because Mary presented with symptoms of schizoaffective disorder, which was consistent with her "historical diagnoses," and in the past, "her symptoms have been improved when she has been on medication."

---

[3] At the hearing, Mary's trial attorney clarified that he had only been appointed to represent Mary in Case No. 2024CF2008, as Mary "has refused to even be interviewed by my office for the other case." The State notes that Mary "does not appear to believe that this [fact] changes the ineffective assistance analysis, and for the purposes of this particular case, the State does not believe so either." As neither party argues that this issue makes a difference for purposes of our analysis on appeal, we will not address it further.

¶14     On cross-examination, Hume explained that her approach "is always to use as few medications as possible and the least possible dose or the dose that the patient responds to."  Typically, following the issuance of an involuntary medication order, she will ask the patient whether they have a preference as to which one of several different antipsychotics they would like to try, and in her experience, patients usually select one of the available options.  Hume explained, however, that if Mary were unable to express a preference, Hume would choose aripiprazole "because that is a medication that she has taken in the past, she did not have documented side effects to it, and it did appear to benefit her."  Hume also clarified that she would add one of the mood stabilizers only if a single antipsychotic did not adequately address Mary's symptoms.

¶15     Mary's attorney then questioned Hume about "any anticipated adverse side effects" of the proposed medications.  Hume responded that the potential side effects "depend on the medication," and that while Hume would be "happy to talk about any specific medication," generally speaking, "the antipsychotic medications can have side effects including things like higher blood sugar, high cholesterol," which are "things that we monitor for."  Hume further testified that "[t]here are some potential movement-related side effects like stiffness," but those side effects can be treated, "or if they're … sufficiently severe, we can switch to a different medicine that seems to be better tolerated."

¶16     Following Hume's testimony, and arguments from the parties, the circuit court granted the request for an involuntary medication order, concluding that the State had satisfied each of the four factors set forth in *Sell v. United States*, 539 U.S. 166 (2003).  *See* *State v. Fitzgerald*, 2019 WI 69, ¶35, 387 Wis. 2d 384, 929 N.W.2d 165 ("Circuit courts may order involuntary medication

to restore a defendant's competency to proceed in a criminal case, provided the four factors the United States Supreme Court established in *Sell* are met.").

¶17    As an initial matter, the circuit court explained that Mary had been diagnosed with schizoaffective disorder, and that diagnosis was "very consistent with" behaviors that Mary had displayed in the courtroom. The court found that Mary's symptoms were "due to having a significant mental illness." The court also found, based on Hume's testimony, that Mary had been offered medications "numerous times" in the past, and while she refused to take them voluntarily, she was unable "to articulate specific reasons why she doesn't want to take the medications outside of delusional beliefs about them."

¶18    The circuit court then stated that medication is "necessary" to address Mary's symptoms and that Mary "does have a history of improving when she's on medications." The court further determined that the treatment plan proposed by Hume is "narrowly tailored to [Mary] as an individual," specifically citing the fact that Hume had eliminated haloperidol from the treatment plan based on Mary's prior reported side effects to that medication.

¶19    Next, the circuit court determined that there is "an important government interest at stake here." The court noted that Mary has been charged with three Class H felonies and two misdemeanors—all as a repeater—which means that she is "facing significant penalties." Given the severity of the crimes and the potential penalties, the court concluded that the State "does have an interest in restoring [Mary] to competency to continue the prosecution of those cases."

¶20    The circuit court then stated that "[i]nvoluntary medication will significantly further" the State's interest in prosecuting Mary. The court explained

8

that Mary "hasn't been on any medications at all" since arriving at MMHI and that her symptoms have not improved without medication. Accordingly, the court stated that the proposed medications "are necessary to have those improvements in her mental health."

¶21 Based on its findings and conclusions during the involuntary medication hearing, the circuit court entered involuntary medication orders in both of the criminal cases against Mary on June 30, 2025.[4] Mary then moved for postdisposition relief. She argued that her trial attorney was constitutionally ineffective during the involuntary medication hearing by failing to adequately cross-examine Hume and by "effectively conced[ing]" during his closing argument that all four of the *Sell* factors had been satisfied.

¶22 At a subsequent hearing on Mary's motion for postdisposition relief, the State raised a concern that because Mary was not competent, she could not waive the attorney/client privilege in order to allow her trial attorney to testify regarding confidential matters. The State argued, however, that the circuit court could deny Mary's postdisposition motion without an evidentiary hearing because the record conclusively showed that counsel's performance was neither deficient nor prejudicial.

¶23 The circuit court agreed that it did not need to hear trial counsel's testimony in order to decide Mary's postdisposition motion, explaining, "We have a transcript that we all have access to [in order] to see what [trial counsel] said. I

---

[4] Pursuant to statute, the involuntary medication orders were automatically stayed for 14 days. *See* WIS. STAT. RULE 809.109(7)(a). Mary filed a motion to continue the stay, which this court denied by order dated August 19, 2025.

don't think why he said what he said at the hearing makes any difference to the analysis." The court noted that no evidence was presented at the involuntary medication hearing that contradicted Hume's testimony regarding the second, third, and fourth *Sell* factors. After hearing arguments from the parties regarding the first *Sell* factor—i.e., whether the State had an important interest in prosecuting Mary for the charged offenses, *see Fitzgerald*, 387 Wis. 2d 384, ¶14—the court stated it still believed the State had satisfied that factor. As a result, the court concluded, as a matter of law, that Mary had failed to establish either deficient performance or prejudice.

¶24 The circuit court entered a written order denying Mary's postdisposition motion on October 2, 2025. Mary now appeals.

## DISCUSSION

### I. Sufficiency of the evidence

¶25 On appeal, Mary argues that the evidence introduced at the involuntary medication hearing was insufficient to support the issuance of the involuntary medication orders. In response, the State asserts that Mary forfeited her arguments regarding the sufficiency of the evidence "when [her trial] counsel failed to make them at the involuntary medication hearing." *See Tatera v. FMC Corp.*, 2010 WI 90, ¶19 n.16, 328 Wis. 2d 320, 786 N.W.2d 810 ("Arguments raised for the first time on appeal are generally deemed forfeited.").

¶26 We do not find the State's forfeiture argument convincing. In the context of an appeal from a criminal conviction, our supreme court has held that "a challenge to the sufficiency of the evidence [may] be raised on appeal as a matter of right despite the fact that the challenge was not raised in the circuit

10

court." ***State v. Hayes***, 2004 WI 80, ¶54, 273 Wis. 2d 1, 681 N.W.2d 203. The State fails to explain why a different rule should apply to an appeal from an involuntary medication order that was entered to restore a defendant to competency in his or her criminal case.[5] We therefore decline to apply the forfeiture rule under the circumstances of this case, and we instead address the merits of Mary's arguments regarding the sufficiency of the evidence.

¶27 In ***Sell***, the United States Supreme Court "held that in limited circumstances the government may involuntarily medicate a defendant to restore his competency to proceed to trial, and it outlined four factors that must be met before a circuit court may enter an order for involuntary medication." ***Fitzgerald***, 387 Wis. 2d 384, ¶2. First, the State must have an important interest in prosecuting the defendant for the charged crime. ***Sell***, 539 U.S. at 180. Second, "the court must conclude that involuntary medication will *significantly further*" the State's interest. ***Id.*** at 181. Third, "the court must conclude that involuntary medication is *necessary* to further" the State's interest. ***Id.*** Fourth, "the court must conclude that administration of the drugs is *medically appropriate, i.e.,* in the patient's best medical interest in light of his medical condition." ***Id.***

¶28 If each of the ***Sell*** factors is satisfied, the circuit court may enter an involuntary medication order; however, "[i]f any factor is unsatisfied, involuntary medication is a violation of the Due Process Clause and is unconstitutional." ***State***

---

[5] Notably, the ***Hayes*** court interpreted WIS. STAT. § 974.02(2), which states, "An appellant is not required to file a postconviction motion in the trial court prior to an appeal if the grounds are sufficiency of the evidence or issues previously raised." *See **State v. Hayes***, 2004 WI 80, ¶8, 273 Wis. 2d 1, 681 N.W.2d 203. The statute setting forth the process for appealing involuntary medication orders similarly states, "The person shall file a motion for postdisposition relief in the circuit court before a notice of appeal is filed unless the grounds for seeking relief are sufficiency of the evidence or issues previously raised." WIS. STAT. RULE 809.109(2)(h).

11

*v. Green*, 2021 WI App 18, ¶16, 396 Wis. 2d 658, 957 N.W.2d 583, *aff'd in part*, 2022 WI 30, 401 Wis. 2d 542, 973 N.W.2d 770. "The State is required to prove the factual components of each of the four factors by clear and convincing evidence." *Id.*

¶29     Wisconsin law is unsettled as to the standard of review that we apply to a circuit court's determination of whether the four *Sell* factors are satisfied. *Green*, 396 Wis. 2d 658, ¶18. "The majority of federal courts review the first factor de novo, although any factual findings relevant to this legal determination are subject to clearly erroneous review." *State v. J.D.B.*, 2024 WI App 61, ¶33, 414 Wis. 2d 108, 13 N.W.3d 525, *review granted*, 2025 WI 8, 18 N.W.3d 694. "These circuits also treat the remaining factors as fact questions subject to clearly erroneous review, although one circuit treats the second factor as a legal question reviewed de novo." *Id.*

¶30     In this case, we need not resolve the uncertainty regarding our standard of review. Even applying de novo review with respect to each of the disputed *Sell* factors, we conclude that the State presented sufficient evidence to support the issuance of the involuntary medication orders.[6]  *See J.D.B.*, 414 Wis. 2d 108, ¶34; *Green*, 396 Wis. 2d 658, ¶20.

   *A. First Sell factor*

---

[6] On appeal, Mary argues that the evidence was insufficient to satisfy the first, second, and fourth *Sell* factors. *See Sell v. United States*, 539 U.S. 166, 180-81 (2003). While Mary at one point contends that the State "failed to meet at least three, and likely all four, of the *Sell* factors," she does not present a developed argument regarding the sufficiency of the evidence related to the third *Sell* factor. Accordingly, we do not address the third *Sell* factor further.

¶31 As noted above, the first *Sell* factor asks whether the State has an important interest in prosecuting the defendant. *See Sell*, 539 U.S. at 180. *Sell* clarified that the State's "interest in bringing to trial an individual accused of a serious crime is important." *See id.* *Sell* did not define what constitutes a "serious crime," and "and the federal circuit courts do not agree on a method for determining whether a crime is 'serious' for purposes of *Sell*." *J.D.B.*, 414 Wis. 2d 108, ¶36. One factor relevant to the analysis, however, is the maximum penalty that the defendant faces. *See id.* For instance, some courts applying *Sell* have determined that "crimes authorizing punishments of over six months are 'serious.'" *See United States v. Palmer*, 507 F.3d 300, 304 (5th Cir. 2007); *see also United States v. Algere*, 396 F. Supp. 2d 734, 739 (E.D. La. 2005); *State ex rel. D.B.*, 214 S.W.3d 209, 213 (Tex. App. 2007); *State v. Velez*, 2022-Ohio-3707, ¶14, 199 N.E.3d 188.

¶32 Here, Mary has been charged with three Class H felonies, each of which carries a maximum sentence of six years' imprisonment, and two Class A misdemeanors, each of which carries a maximum sentence of nine months' imprisonment. *See* WIS. STAT. §§ 939.50(3)(h), 939.51(3)(a). Those maximum penalties are further increased by the fact that Mary has been charged as a repeater for each crime. *See* WIS. STAT. § 939.62(1)(a)-(b). Thus, the maximum penalties for Mary's charges far exceed the six-month penalty that has been deemed to denote a "serious crime" by some courts. *See Palmer*, 507 F.3d at 304.

¶33 Moreover, when determining whether a crime is serious for purposes of the first *Sell* factor, we must also consider "the facts of the individual case in evaluating the [State's] interest in prosecution." *Sell*, 539 U.S. at 180. In Case No. 2024CF2008, Mary has been charged with knowingly fleeing or eluding an officer, an offense that has the potential to endanger both the public and law

13

enforcement. Additionally, as the circuit court recognized, Mary's driving behavior that led to the police encounter and the fleeing or eluding charge was "inherently dangerous," as Mary reportedly drove through a school zone at a high rate of speed, on the wrong side of the road, and nearly hit a postal worker. Under these circumstances, we agree with the State that Mary has been charged with a "serious crime" for purposes of the first *Sell* factor.

¶34 In arguing to the contrary, Mary emphasizes that the legislature has defined the terms "serious crime" and "serious felony" in "multiple contexts," and none of the statutes defining those terms include any of the crimes with which Mary has been charged. *See, e.g.*, *J.D.B.*, 414 Wis. 2d 108, ¶36 (noting that the definition of "serious crime" in WIS. STAT. § 969.08, for purposes of modifying or revoking bail, specifically includes the offense of battery to a law enforcement officer). Mary, however, cites no binding authority in support of the proposition that an offense cannot be considered a "serious crime," for purposes of the first *Sell* factor, unless the legislature has included that offense in a statutory definition of the term "serious crime" or "serious felony." Moreover, we agree with the State that "a crime's maximum penalty is, in and of itself, an indicator of how serious the legislature considers a crime."

¶35 Our conclusion that Mary has been charged with a serious crime does not end our analysis of the first *Sell* factor, however, because even if a defendant has been charged with a serious crime, "[s]pecial circumstances may lessen the importance of" the State's interest in prosecuting the defendant. *See Sell*, 539 U.S. at 180. Mary argues that two such special circumstances are relevant here: (1) the length of her pretrial detention and her resultant sentence credit; and (2) the "extensive delay between when [she] was committed and when she received restorative treatment."

¶36 "[T]he possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed …)" is a factor that "affects, but does not totally undermine, the strength of the need for prosecution." *Id.* Mary asserts that, at the time of the involuntary medication hearing, she had already accumulated over seven months of sentence credit, which she characterizes as a "significant amount of credit." As the State notes, however, the maximum possible sentence credit at that time would have actually been just over six months—from the time that Mary was arrested on the bench warrant on December 17, 2024, until the involuntary medication hearing on June 27, 2025. We agree with the State that this amount of sentence credit "is not significant in light of [Mary's] substantial sentencing exposure, given that she faces multiple Class H felonies, each [of which] has a maximum penalty of six years['] imprisonment." Under these circumstances, the length of Mary's pretrial detention does not significantly lessen the State's interest in prosecuting her for the charged crimes.

¶37 As for the delay between Mary's commitment and the onset of treatment, this court has previously held that a defendant's "due process rights are violated if the defendant fails to receive competency restoration treatment within a reasonable amount of time following the court's entry of the order of commitment." *J.D.B.*, 414 Wis. 2d 108, ¶51. In *J.D.B.*, the defendant "was ordered committed on October 11, 2022[,] and was to be transported 'forthwith' to the appropriate facility for treatment, but he remained in the county jail until January 25, 2023, when he was transferred to [MMHI] for treatment." *Id.*, ¶52. We concluded that this delay of over three months was "incongruous with constitutional demands" and that "this unconstitutional detention further lessen[ed] the importance of the State's interest in prosecuting" the defendant. *Id.*

15

¶38    Mary argues that the delay in this case was even more egregious than the delay in *J.D.B.* because she was committed to DHS custody on February 7, 2025, but was "not admitted into MMHI to begin competency restoration treatment until June 13, 2025"—over four months later.   This argument, however, overlooks the fact that Mary was not admitted to MMHI immediately following her commitment because the circuit court declined to order inpatient treatment when it found Mary incompetent in February 2025.   In March 2025, the DHS informed the court that Mary was not suitable for participation in the "Outpatient Competency Restoration Program" but was eligible to begin receiving "Jail Based Remediation Services."   The DHS further informed the court that DHS staff would "begin actively working with [Mary] to establish a remediation plan for her and provide services" while she was in jail. As noted, Mary was subsequently admitted to MMHI on June 13, 2025.   We agree with the State that these circumstances do not show "that there was any significant delay in treatment that would weigh against the State's interest" in prosecuting Mary.   We further agree that the State "should not be faulted for first attempting to provide [Mary] with treatment on an outpatient basis," as ordered by the circuit court.

¶39    For all of these reasons, we conclude that the evidence introduced at the involuntary medication hearing was sufficient to establish that the State has an important interest in prosecuting Mary for the charged crimes.  Consequently, the State met its burden with respect to the first *Sell* factor.

*B. Second Sell factor*

¶40    The second *Sell* factor requires a court to determine whether involuntary medication will significantly further the State's interest in prosecuting

16

the defendant. *Sell*, 539 U.S. at 181. Under this factor, a court "must find that administration of the drugs is substantially likely to render the defendant competent to stand trial" and "is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id.* For the State to meet its burden under this factor, "[i]t is not enough for the State to simply offer a generic treatment plan with a medication and dosage that are generally effective for a defendant's condition." *Green*, 396 Wis. 2d 658, ¶34. Instead,

> the circuit court must consider the defendant's particular circumstances and medical history to assess the underlying factual questions of whether a particular medication is substantially likely to render a particular defendant competent and substantially unlikely to have side effects that interfere with that defendant's ability to participate in his or her own defense.

*Id.*

¶41     Mary argues that the State failed to meet its burden under the second *Sell* factor because Hume's proposed individual treatment plan was "unconstitutionally generic." More specifically, Mary argues that the treatment plan was not sufficiently individualized because although Hume "[did] not request [h]aloperidol, due to perceived side effects from past usage, and [did] request [a]ripiprazole due to its previous effectiveness," Hume did not "explain why any of the other six requested drugs are appropriate given [Mary's] particular medical history and treatment needs."

¶42     We disagree that Hume's treatment plan was not sufficiently individualized to Mary. Hume explained that the five alternative antipsychotic medications listed in the treatment plan were all appropriate for Mary because they had similar risk and benefit profiles. Hume further explained that Mary would be

administered only one of those antipsychotics, and if Mary were unwilling or unable to choose one of them, Hume would choose aripiprazole, as that medication had caused Mary to become "symptom free" in the past, without any reported side effects.

¶43    Hume further explained that in patients like Mary who display "prominent manic symptoms," it may be necessary to treat with a mood stabilizer, in addition to an antipsychotic.  Hume explained that if an antipsychotic alone were not sufficient to address Mary's symptoms, Hume would ask Mary which of two mood stabilizers she preferred, as both of those medications "are reasonable treatment options and have comparable risks and benefits."  Hume also noted that Mary's records showed that she had taken one of those mood stabilizers, valproic acid, in the past.  On this record, we reject Mary's argument that Hume failed to adequately explain why the medications listed in the treatment plan were medically appropriate for Mary.

¶44    Mary also faults Hume for failing to "individualize any of the listed dosages to [Mary's] particular medical information or history."  In the treatment plan, Hume listed the maximum oral dose for each of the antipsychotics, stating that those maximum doses "correspond[ed] to a typical maximum dose" of each medication.    Mary asserts, however, that those maximum doses merely corresponded to "the maximum dosages listed on each drug's FDA label," and that Hume failed to explain why those maximum doses would be safe or appropriate for Mary, specifically.  Mary then cites *J.D.B.*, where this court concluded that the dose ranges listed in a treatment plan were not sufficiently individualized to the defendant because they were merely based on "the ranges submitted by the manufacturer to the FDA," without any evidence as to why those generic dose ranges were appropriate for the defendant.  *J.D.B.*, 414 Wis. 2d 108, ¶59.  "In

18

other words, there was no evidence that [the defendant was] a generic patient for [whom] the generic dose range[s] submitted by the manufacturer to the FDA would be medically appropriate." *Id.*

¶45 This argument is unpersuasive because Hume *did* provide additional information explaining why the maximum doses listed in the treatment plan were medically appropriate for Mary. Specifically, Hume noted that none of the listed medications "require[d] dose adjustments due to medical issues, individual physical characteristics (e.g., height, weight) of the subject, or interactions with other medications." Thus, unlike in *J.D.B.*, the record here *does* contain evidence that Mary is a "generic patient" for whom the generic maximum doses submitted by the manufacturers to the FDA would be medically appropriate. *See id.*

¶46 Next, Mary contends that the treatment plan is deficient because it does not contain any "timeline" for Hume to "report back to the [circuit] court regarding the medications." Mary notes that, in *Green*, this court stated that *Sell* "requires an individualized treatment plan that," among other things, "identifies … 'the duration of time that involuntary treatment of the defendant may continue before the treating physicians are required to report back to the court.'" *Green*, 396 Wis. 2d 658, ¶38 (quoting *United States v. Chavez*, 734 F.3d 1247, 1253 (10th Cir. 2013)). Notably, however, WIS. STAT. § 971.14(5)(b) states that a defendant who has been committed for treatment to competency must be "periodically reexamined by [DHS] examiners" and that "[w]ritten reports of examination shall be furnished to the court 3 months after commitment, 6 months after commitment, 9 months after commitment and within 30 days prior to the expiration of commitment." Mary does not develop any argument "that [DHS] examiners providing the periodic reviews … as required under § 971.14(5)(b) would fail to provide the circuit court with a summary of [her] recent medication

19

history and responses to medications," as required by **Green**. *See **State v. D.E.C.***, 2025 WI App 9, ¶36 n.10, 415 Wis. 2d 161, 17 N.W.3d 67 (2024), *review denied*, 2025 WI 16, 23 N.W.3d 216.

¶47    For these reasons, we reject Mary's arguments that the evidence introduced at the involuntary medication hearing was insufficient to satisfy the second **Sell** factor.

### C. Fourth **Sell** factor

¶48    As noted above, under the fourth **Sell** factor, "the court must conclude that administration of the drugs is *medically appropriate, i.e.,* in the patient's best medical interest in light of his medical condition." **Sell**, 539 U.S. at 181. Mary contends that the involuntary medication orders in her case failed to satisfy this factor for three reasons.

¶49    First, Mary notes that the individual treatment plan states that Mary "would ONLY be administered medication by injection if she refused to take the medication orally," and "[i]n the unlikely event that she persistently refuses oral medications, [Hume] would administer a long-acting injectable to avoid the need for daily injections." Mary faults Hume for failing to provide "information about what medications she would be injecting, what doses or dosages she would be administering, or whether the selected injections are appropriate given [Mary's] medical history." We reject this argument because Mary cites no legal authority in support of the proposition that, in cases like this one, where a treatment plan sets forth a maximum dose for an oral form of a medication, the treatment plan must also state a maximum dose for the injectable form of that same medication to be used in the event the patient refuses to take the oral medication. *See **State v.**

*Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("Arguments unsupported by references to legal authority will not be considered.").

¶50 Second, Mary asserts that Hume "never documented or explained the most consequential side effects of any of the proposed drugs." The treatment plan stated that the medications' side effects included "weight gain, metabolic side effects, movement-related side effects, [and] rarely neuroleptic malignant syndrome." Moreover, as discussed above, Hume explained during the involuntary medication hearing that the antipsychotic medications listed in the treatment plan "can have side effects including things like higher blood sugar, high cholesterol," as well as "some potential movement-related side effects like stiffness." While Mary asserts that Hume should have also "discuss[ed] the more serious side effects" of these medications, Mary does not explain what additional side effects she believes Hume should have addressed. Accordingly, Mary's argument on this point is undeveloped, and we decline to address it further. *See id.* (noting that this court may decline to address undeveloped arguments).

¶51 Third, Mary asserts that Hume failed to provide sufficient information about "what dosages would be given to [Mary] for any of the requested oral medications." Mary notes that while Hume listed the maximum daily oral doses for the antipsychotics, "she did not state what particular doses she would start with, nor did she explain why each starting dose would be medically appropriate given [Mary's] medical history and treatment needs." Mary also notes that Hume "did not provide any dosages" for the mood stabilizers lithium and valproic acid, instead stating that the doses for those medications would be "determined by blood level."

21

¶52     We reject Mary's arguments that the treatment plan failed to provide sufficient information about the proposed doses of the medications listed therein. With respect to the antipsychotics, Hume provided maximum daily doses for those medications in the treatment plan, and she then explained at the involuntary medication hearing that her approach is to use "the least possible dose or the dose that the patient responds to." This court approved a similar approach in *D.E.C.*, where the treating physician expressed an intent to "start with the lowest possible dose and work upwards." *D.E.C.*, 415 Wis. 2d 161, ¶47. As for Mary's argument regarding the mood stabilizers, we agree with the State that Mary has cited no legal authority in support of the proposition that

> when a medication is contemplated as a back-up medication that will be administered after other medications have been tried (like the mood stabilizers here) that the physician cannot simply explain how maximum dosages will be calculated instead of providing an absolute number that may not even be available to the physician until after the initial medications are administered.

Again, this court need not consider arguments that are unsupported by references to legal authority. *Pettit*, 171 Wis. 2d at 646.

¶53     Accordingly, we reject Mary's argument that the State failed to present sufficient evidence to satisfy the fourth *Sell* factor.

## II. Ineffective assistance of counsel

¶54     In the alternative, Mary argues that her trial attorney was constitutionally ineffective in multiple respects at the involuntary medication hearing. Mary further argues that the circuit court erred by denying her postdisposition motion alleging ineffective assistance of counsel without an evidentiary hearing.

¶55 Whether an attorney rendered ineffective assistance is a mixed question of fact and law. *State v. Nielsen*, 2001 WI App 192, ¶14, 247 Wis. 2d 466, 634 N.W.2d 325. We will uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.* However, whether the defendant's proof is sufficient to establish ineffective assistance is a question of law that we review independently. *Id.*

¶56 An evidentiary hearing, commonly referred to as a *Machner* hearing, "is a prerequisite for consideration of an ineffective assistance claim." *State v. Sholar*, 2018 WI 53, ¶50, 381 Wis. 2d 560, 912 N.W.2d 89; *see also State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979). "A defendant is entitled to a *Machner* hearing only when his motion alleges sufficient facts, which if true, would entitle him to relief." *Sholar*, 381 Wis. 2d 560, ¶50. If the motion "does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing." *Id.* (citation omitted).

¶57 To prevail on an ineffective assistance of counsel claim, a defendant must typically show both that his or her attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient performance, the defendant must point to specific acts or omissions by counsel that are "outside the wide range of professionally competent assistance." *Id.* at 690. To demonstrate prejudice, the defendant must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the

outcome." ***Id.*** at 694. If a defendant fails to make a sufficient showing on one prong of the ***Strickland*** test, we need not address the other. ***Id.*** at 697.

¶58    Mary argues, however, that under ***United States v. Cronic***, 466 U.S. 648 (1984), we must presume that her trial attorney's performance was prejudicial. ***Cronic*** held that "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable," and prejudice is presumed for purposes of an ineffective assistance claim. ***Id.*** at 659-60.

¶59    This exception to the ***Strickland*** analysis, however, is "exceedingly narrow." ***United States v. Theodore***, 468 F.3d 52, 56 (1st Cir. 2006). For instance, in ***Bell v. Cone***, 535 U.S. 685, 691-92, 697-98 (2002), the United States Supreme Court rejected the defendant's argument that the ***Cronic*** exception applied when the defendant's attorney failed to introduce any mitigating evidence and entirely waived his closing argument at the defendant's capital sentencing hearing. The Court explained, "When we spoke in ***Cronic*** of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete." ***Bell***, 535 U.S. at 696-97. The Court continued, "Here, respondent's argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points," which was the type of claim subject to the ***Strickland*** analysis. ***Bell***, 535 U.S. at 697-98. "In the wake of ***Bell***, courts have rarely applied ***Cronic***, emphasizing that only non-representation, not poor representation, triggers a presumption of prejudice." ***Miller v. Martin***, 481 F.3d 468, 473 (7th Cir. 2007).

24

¶60   Mary has not established that her trial attorney completely failed to test the State's case at the involuntary medication hearing, such that *Cronic*, rather than *Strickland*, applies to her ineffective assistance claims. Mary's trial attorney was present at the involuntary medication hearing and participated in the hearing by cross-examining Hume and making a closing argument. While Mary criticizes the manner of counsel's cross-examination and argues that counsel erred by making certain concessions and failing to emphasize certain points during his closing argument, Mary has failed to show that counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." *See Cronic*, 466 U.S. at 659. As such, we apply the *Strickland* analysis to Mary's ineffective assistance claims.[7]

¶61   Applying the *Strickland* analysis, we conclude that the circuit court properly rejected Mary's ineffective assistance claims without a *Machner* hearing because Mary's postdisposition motion failed to allege sufficient facts to demonstrate that Mary was prejudiced by counsel's alleged errors. Stated differently, Mary's motion failed to show a reasonable probability that the result of the involuntary medication hearing would have been different absent the alleged errors.

¶62   In her postdisposition motion, Mary first challenged the effectiveness of her trial attorney's closing argument regarding the first *Sell* factor—i.e., whether the State had an important interest in prosecuting Mary

---

[7] Mary also cites *McCoy v. Louisiana*, 584 U.S. 414 (2018), in support of her claim that her trial attorney's conduct was per se prejudicial. We agree with the State that Mary forfeited any argument based on *McCoy* by failing to raise it in her postdisposition motion. *See Tatera v. FMC Corp.*, 2010 WI 90, ¶19 n.16, 328 Wis. 2d 320, 786 N.W.2d 810.

because she had been charged with a serious crime. *See Sell*, 539 U.S. at 180. Mary contends that when addressing this factor, her attorney "did not mention the facts that the felonies charged were low-level Class H felonies; that none of the allegations against [Mary] included any violent acts whatsoever; and that none of the alleged crimes were included in Wisconsin's definition of 'serious' crimes in any statute."

¶63     These arguments fail because we have already concluded, as a matter of law, that Mary was charged with a serious crime for purposes of the first *Sell* factor. The fact that Mary was charged with "low-level Class H felonies" does not change our analysis, given the maximum penalties involved and the seriousness of the underlying conduct. *See supra* ¶¶31-33. Furthermore, while Mary's conduct may not have involved violent acts, Mary fails to acknowledge the danger posed by her driving behavior and her fleeing in her vehicle from a traffic stop. Additionally, we have already rejected Mary's argument that her crimes were not serious because they are not included in any statutory definition of the term "serious crime." Consequently, it is not reasonably probable that the result of the involuntary medication hearing would have been different had Mary's attorney raised these arguments regarding the first *Sell* factor.

¶64     Mary's postdisposition motion also alleged that her attorney should have cited three federal cases to support an argument that Mary was not charged with any serious crimes. Those cases, however, are either inapt or unpersuasive. In *United States v. Berry*, 911 F.3d 354, 362-66 (6th Cir. 2018), the court assumed without deciding that planting a fake bomb *was* a serious crime, but it ruled against the government on the first *Sell* factor based on other mitigating circumstances. In *United States v. White*, 620 F.3d 401, 410-11 (4th Cir. 2010), the court concluded that the charges against the defendant were, in fact, serious

crimes. Additionally, ***United States v. Dumeny***, 295 F. Supp. 2d 131, 132-33 (D. Me. 2004), is materially distinguishable because it involved a single charge of possession of a firearm by a person previously committed to a mental health institute, not the multiple charges at issue here. Accordingly, it is not reasonably probable that the outcome of the involuntary medication hearing would have been different had Mary's attorney cited these federal cases.

¶65 Mary also argued in her postdisposition motion that during his argument regarding the first ***Sell*** factor, her attorney should have emphasized that she had been "confined to jail and [MMHI] since approximately December 17, 2025," and that there was an "extensive delay between when [she] was committed and when she received restorative treatment." We have already concluded, however, that neither of these considerations lessens the State's important interest in prosecuting Mary under the first ***Sell*** factor. *See supra* ¶¶35-38. Consequently, Mary cannot show that she was prejudiced by her attorney's failure to raise these arguments at the involuntary medication hearing.

¶66 Mary's postdisposition motion further asserted that her trial attorney was ineffective with respect to the second ***Sell*** factor by failing to argue that the individual treatment plan presented by Hume was too generic and was not sufficiently individualized to Mary. However, we have already rejected Mary's arguments that the treatment plan was not sufficiently individualized. *See supra* ¶¶41-45.

¶67 Finally, with respect to the fourth ***Sell*** factor, Mary's postdisposition motion argued that her trial attorney was ineffective by failing to question Hume "or challenge her conclusions regarding several critical components of her report"—specifically: (1) Hume's failure to specify what doses of injectable

medications would be administered to Mary in the event that she refused oral medications; (2) Hume's failure to explain "the most serious side effects" of the proposed medications; (3) Hume's failure to specify the starting doses for the oral medications listed in the treatment plan; and (4) Hume's statement that the doses of the mood stabilizers would be determined "by blood level."

¶68 We have already rejected Mary's arguments that the individual treatment plan was required to provide specific doses for the injectable forms of the listed medications, starting doses for the oral medications, or specific doses for the mood stabilizers. *See supra* ¶¶49-52. Additionally, we note that while Mary argues that the medications listed in the treatment plan have serious side effects that Hume failed to address, Mary's postdisposition motion failed to explain what any of those side effects are. The motion therefore failed to establish a reasonable probability that the result of the involuntary medication hearing would have been different had Mary's attorney questioned Hume regarding these topics.[8]

¶69 Because Mary's postdisposition motion failed, as a matter of law, to establish that Mary was prejudiced by her attorney's alleged errors at the involuntary medication hearing, the circuit court properly denied Mary's postdisposition motion without an evidentiary hearing.

---

[8] Moreover, we agree with the State that Mary does not account for the very real possibility that if her attorney had further cross-examined Hume regarding the topics outlined in Mary's postdisposition motion, Hume would have provided additional information regarding those topics that would have remedied any alleged deficiencies in the individual treatment plan.

28

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.